**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| KEITH D. PEASE, | ) |
| | ) |
|   Plaintiff, | ) |
| | ) |
|    vs. | ) Cause No. 1:14-cv-2123-WTL-MPB |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|   Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Keith D. Pease requests judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). The Court rules as follows.

## I. PROCEDURAL HISTORY

Pease filed his application for SSI on May 11, 2012, alleging disability beginning May 11, 2012, due to a learning disability, anxiety, depression, vision problems, and a head injury. His application was denied initially on September 12, 2012, and upon reconsideration on November 9, 2012, whereupon he requested and was granted a hearing before an administrative law judge ("ALJ"). Pease was represented by counsel at the hearing, which was held on March 10, 2014, before ALJ Daniel J. Mages. Pease and a vocational expert testified at the hearing. Thereafter, on June 27, 2014, the ALJ rendered his decision in which he concluded that Pease was not disabled as defined by the Act. After the Appeals Council denied Pease's request for review of the ALJ's decision, he filed this timely action for judicial review.

## II. EVIDENCE OF RECORD

### A. Relevant Medical Evidence

In April 2006, Pease was assessed by Herbert Henry, Ph.D. R. at 175-87. Dr. Henry observed that Pease's dress and hygiene were appropriate and that he arrived at his appointment on his own. *Id.* at 175, 176. He also reported that Pease was able to attend to his hygiene without assistance, and that Pease reported he was able to cook, clean, do laundry, and shop without assistance. Dr. Henry's report found that Pease had a valid Full Scale IQ score of 64, which "falls into the mild mental retardation range; however, his level of functioning exceeds the level of adjustment characteristic for mildly retarded individuals." *Id.* at 181. Dr. Henry diagnosed Pease with a depressive disorder, borderline intellectual functioning, and a GAF score of 80. *Id.* at 183. Dr. Henry also noted that Pease was able to manage his own funds. *Id.* at 181.

Also in April 2006, Pease was referred to Midtown Community Mental Health Center ("Midtown"), where he received several months of outpatient mental health counseling for depression. In addition to counseling, he was seen by Dr. Robert Holt at Midtown for a medication review. Dr. Holt increased his dosages of Prozac and trazodone. Dr. Holt noted that Pease reported that he was "in special ed classes in school . . . [d]id not learn to read or write . . . . At age 11 was in a car accident and smashed the top of his head, more trouble learning after that. . . . Worked as a security guard. Liked the work but had a hard time keeping jobs since he could not fill out forms." *Id.* at 205. Dr. Holt further noted that Pease "seem[ed] to be of average intelligence in [his] interview though [his] history suggests a low IQ." *Id.* Pease stopped reporting to Midtown in August of 2006 despite the clinic's attempts to reestablish services. *Id.* at 215.

In November 2008, Pease was admitted to the emergency room at Wishard Hospital with complaints of occasional chest pain. Pease was referred to Midtown for evaluation and treatment for anxiety. He was seen again at Midtown complaining of depression and anger issues in June 2009.  *Id.* at 199.

Beginning in May 2012 Pease again sought mental health treatment from Midtown.  *Id.* at 232.  In June 2012, he was prescribed individual counseling, case management, and medication evaluation and management.  *Id.* at 233.  His intellectual functioning was noted to be average to below average, and he reported that he was "troubled by not knowing how to read."  *Id.* at 229, 232.  In late August 2012, he called to reschedule his appointment because he did not have the money to pay his copayment.  He failed to show up for his rescheduled appointment in September.  *Id.* at 239.

In July 2012, Pease underwent a consultative mental status examination by psychologist Brandon Robbins, Psy.D.  *Id.* at 248-50. During his examination, Pease reported that he resided alone and was frequently anxious when interacting with strangers. Pease explained that he dropped out of school after the eighth grade due to disinterest in school and that he regretted not remaining in school and learning to read.  Pease reported that he was last employed in 2002 for six months before he quit, "because it wasn't enough hours." Pease also stated that prior to that job he worked at another security agency for one year before he was terminated because of his inability to fill out the necessary reports.

Dr. Robbins' mental status evaluation report stated that Pease arrived alone and walked to the examination, was oriented to time, person, place and situation, and was attentive to the tasks requested of him. Further, his speech was logical and relevant, he was cooperative and interactive with the evaluator, and there were no notable impairments in thought content or form.

Pease stated that he was able to cook simple meals such as soup and sandwiches and do household chores such as picking up after himself, laundry by hand, and cleaning the bathroom. Pease stated that he had no problems shopping, and that he was able to perform personal hygiene tasks such as dressing, bathing, and grooming. Pease reported that his current daily tasks included taking care of his dog and letting the dog outside, doing chores around the house, and walking to the dollar store to buy items.

Dr. Robbins' medical source statement opined that Pease had moderate symptoms of depression and anxiety and cognitive deficits including mild impairment in memory and concentration. His long-term memory appeared intact. Dr. Robbins opined that Pease's intellectual abilities most likely fell in the borderline range and that "[d]ue to his symptoms, he would require longer than normal to learn new tasks due to concentration and cognitive problems." He would "do better at repetitive tasks and might have difficulty with tasks that require him to frequently remember information," but his practical judgment and reasoning were not significantly impaired and would be adequate to make simple, work-related decisions. Additionally, Dr. Robbins opined that Pease displayed adequate social behavior and would be able to interact appropriately with coworkers and supervisors in a work environment. Dr. Robbins assessed a current GAF score of 50 and noted that Pease demonstrated the mental and emotional capabilities to understand and manage his own money. *Id.* at 250.

### B. Hearing Testimony

At the hearing, Pease testified that he lived alone and that he had never had a driver's license and had never tried to obtain one. He testified that he had walked to the hearing that morning. *Id.* at 32. With regard to education, Pease testified that the highest grade he completed in school was the eighth grade and that he had been in special education classes starting in the

fourth grade after he suffered a head injury in an automobile accident. He had not had any job training and he had not tried to obtain a GED. *Id.* at 32-33. He testified that he knew his letters, but "[a]s far as like reading a book to you or writing a letter to you, I can't do that." When asked if he could read any parts of the newspaper, he answered "very, very little"; when asked if he could read a grocery list with "real simple words" like milk and eggs, he answered "maybe something like that." *Id.* at 33-34.

With regard to his daily routine, Pease testified that he was able to shower and dress himself and prepare his own meals like "cold cuts, lunchmeat and stuff . . . that I don't really have to cook." He testified that he "probably could" make a "more elaborate meal" that required him to use the microwave or stove. *Id.* at 36. He testified that he went to "the little corner market" to buy "lunch meat and bread and . . . milk and maybe coffee and stuff." *Id.* He was able to do his own laundry but he needed help if "the washer's like a computer." *Id.* at 37. Pease testified that he did not do chores like dishes, dusting, and vacuuming because he tended to "give up" and because of his depression. *Id.*

With regard to social activity, Pease testified that he had difficulty being around a lot of people because of his anxiety, and that that was true even in groups of only four to five people.

### III. <u>APPLICABLE STANDARD</u>

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. ' 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous

work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. ' 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not

required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

### IV. THE ALJ'S DECISION

The ALJ found at step one that Pease had not engaged in substantial gainful activity since his alleged onset date of May 11, 2012. At steps two and three, the ALJ found that Pease had the severe impairments of astigmatism, amblyopia, borderline intellectual function, depression, anxiety, and posttraumatic stress disorder (PTSD) features, but that his impairments, singly or in combination, did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Pease had

> the residual functional capacity to perform work at all exertional levels (20 CFR 416.967) with the following nonexertional limitations: no climbing ladders, ropes or scaffolds; no work around dangerous moving machinery or at unprotected heights; no fine visual acuity; simple routine tasks with the ability to attend, concentrate and persist for two hours at a time; and no more than superficial interaction with the public, coworkers, or supervisors.

R. at 18. Given that Pease has no past relevant work, the ALJ determined that the transferability of job skills was not an issue. At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Pease could perform, including landscape specialist, industrial cleaner, and houseman. Further, the ALJ clarified that despite his finding based upon the evidence of record and the testimony of the claimant that Pease is not illiterate as defined by the Social Security regulations, even if he were unable to read or write, Pease could perform unskilled medium jobs in the state and national economy including crate liner, hospital cleaner, and houseman. Accordingly, the ALJ concluded that Pease was not disabled as defined by the Act.

## V. <u>DISCUSSION</u>

Pease argues that the ALJ erred by failing to properly consider whether his intellectual deficits meet or equaled Listing 12.05(C), or at least by failing to adequately articulate his reasoning with regard to that issue. The Court agrees.

As the claimant, Pease "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Listing 12.05(C), in relevant part, states the following:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. § 404, Subpt. P, App. 1, 12.05. Further, the Code of Federal Regulations states that "[t]he structure of the listing for intellectual disability (12.05) is different from that of the other mental disorder listings," as it "contains an introductory paragraph with the diagnostic description for intellectual disability [and] . . . four set of criteria (paragraphs A through D). If . . . [the claimant's] impairment satisf[ies] the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." *Id.* Hence, the Plaintiff must first satisfy Listing 12.05(C)'s prerequisite of "subaverage general intellectual functioning and deficits in adaptive function initially manifested during the

developmental period . . . ," and then satisfy one of the four criteria showing severity. *Id.; see also Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (stating that "the key term in the introductory paragraph of section 12.05 of the regulation . . . is 'deficits in adaptive functioning.'").

The ALJ concluded that "the evidence of record does not document considerable deficits in adaptive functioning," but rather demonstrates that Pease has "moderate to high-level adaptive function":

> [He] lives alone and independently, attends to personal hygiene and grooming. He prepares daily meals, cleans, and does laundry. . . . He walks or receives rides to errands and appointments. [He] handles personal finances and shops for food and other necessities. He attends church regularly and socializes with his pastor.

R. at 16. The ALJ does not indicate what his definition of "deficits in adaptive functioning" is. While the Listing does not provide a definition, the Seventh Circuit, citing to the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV–TR)* 42 (4th ed. 2000), has suggested generally that the term means "the inability to cope with the challenges of ordinary everyday life" *Novy*, 497 F.3d at 710. As the Seventh Circuit has recently noted in another context:

> The medical community measures adaptive behavior across three domains: conceptual, social, and practical. To satisfy this component of the definition, a person's adaptive functioning in at least one domain must be "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." Moreover, the deficits must be caused by the person's intellectual impairment. The *DSM–V* requires that the deficits in both intellectual and adaptive functioning appear during childhood or adolescence.

*McManus v. Neal*, 779 F.3d 634, 650-51 (7th Cir. 2015) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33, 38 (5th ed. 2013)) (footnote omitted). While Listing 12.05 does not require that the Commissioner apply the criteria set forth in the

9

DSM, *cf.* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018, 20022 (Apr. 24, 2002) (Listing 12.05 "does not seek to endorse the methodology of one professional organization over another. . . . SSA's definition establishes the necessary elements, while allowing the use of any of the measurement methods recognized and endorsed by the professional organizations."), the Court agrees with Pease that those criteria are instructive. If the ALJ chose not to apply those criteria, he should have articulated what criteria he was applying; the Court agrees with Pease that remand is appropriate to give the ALJ the opportunity to do so and to more clearly explain his reasoning with regard to Listing 12.05. This is especially true because the record as a whole suggests that Pease may have the required deficits: he has been unable to hold a job; he does not drive; the meals he prepares consist primarily of cold cuts and canned soup; he struggles to complete household chores and needs assistance using the controls of a washing machine; his shopping consists of buying a few items at the corner store; and he appears to have little interaction with his community.

      The ALJ's suggestion that Pease has "high-level adaptive functioning" appears to be based, at least in part, on his determination that Pease's testimony about his own abilities is not credible. Specifically, the ALJ discredited Pease's testimony (and consistent reports to his mental health care providers and evaluators) that he is unable to read or write based on the fact that he "independently completed an Adult Function report (Exhibit 6E) with few spelling or grammatical errors." R. at 20. The Court agrees with the ALJ that the person who completed the form cited is far from illiterate. However, it is not at all clear to the Court that Pease was that person. One of Pease's answers on the form is "I can't read at all"; this cannot be squared with the fact that he is listed as the "person completing this form." *Id.* at 150, 152. It is entirely possible that someone else read the form to Pease and wrote his answers, believing that Pease

was still the "person completing the form" because the answers were his. Before the ALJ used the form to discredit Pease's otherwise consistent claim that he has the inability to read more than very simple words, he should have asked Pease whether he actually completed it. He should explore this issue on remand.

In addition, the ALJ's evaluation of Pease's IQ is not entirely clear. On remand, he should make it clear whether he believes Pease's IQ score of 64 is invalid and, if so, explain what that conclusion is based upon.

## VI. CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this Entry.

SO ORDERED: 3/28/16

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.